**ELI LILLY AND COMPANY, Plaintiff,**

v.

**MEDTRONIC, INC., Defendant.**

**Civ. A. No. 83–5393.**

United States District Court,
E.D. Pennsylvania.

April 21, 1988.

Timothy J. Malloy, Lawrence M. Jarvis, Gregory J. Vogler, Chicago, Ill., Richard G. Schneider, Philadelphia, Pa., for plaintiff.

Philip S. Johnson, Albert W. Preston, John J. Mackiewicz, Gary H. Levin, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Plaintiff Eli Lilly and Company brought this suit against defendant Medtronic, Inc. alleging infringement by Medtronic of two United States patents, No. Re. 27,757, reexamined and issued as Bl Re. 27,757 (the 757 patent) and No. 3,942,536, reexamined and issued as Bl 3,942,536 (the 536 patent). At the close of Medtronic's case, with the agreement of the parties, I granted Lilly's motion for a directed verdict with regard to the validity of the 536 patent and its infringement by Medtronic's Model 7210 and its associated leads. The jury subsequently returned a verdict in favor of Lilly, having found Medtronic's devices to infringe the claims of the 757 patent. The jury also decided that Medtronic's infringement of the 757 and 536 patents was willful. The parties agreed to submit for my determination the issue as to whether the alleged inequitable conduct of the patents' inventors,[1] Dr. Michel Mirowski and Dr. Morton

---

1. Dr. Michel Mirowski is the inventor of the 757 patent. Dr. Mirowski, Dr. Morton Mower, and Rollin H. Denniston, a Medtronic engineer, are listed as the inventors of the 536 patent.

Mower, before the United States Patent and Trademark Office (PTO) during the prosecution and reexamination of the patents-in-suit renders both patents unenforceable. For the reasons which follow and based upon the findings of fact and conclusions of law made of record on April 15, 1988, I conclude that Medtronic has failed to prove by clear and convincing evidence that the patents-in-suit are unenforceable because of inequitable conduct on the part of their inventors. Since I find that both patents-in-suit are enforceable, I will direct that judgment be entered in favor of Lilly and against Medtronic in accordance with the jury's verdict.

Medtronic contends that Drs. Mirowski and Mower were guilty of certain instances of inequitable conduct with regard to each of the patents in suit. I will discuss each of Medtronic's claims.

## A. *The 757 Patent*
### 1. Conduct During Initial Prosecution of the 757 Patent

Medtronic argues that, in 1972, during the prosecution of the 757 patent, Dr. Mirowski and his counsel, Ronald Cohn, Esq., were guilty of inequitable conduct because they failed to disclose as prior art to Examiner William E. Kamm, the patent examiner who was reviewing the 757 patent application,[2] an article published in 1954, by Dr. John Hopps. Medtronic contends that the Hopps article renders the 757 patent invalid because it specifically teaches the use of an electrode positioned within the heart for defibrillation, one of the features of the claims of the 757 patent.

The patent application for the 757 patent was first filed on February 9, 1970, by Ronald Cohn, Dr. Mirowski's counsel. Medtronic counsel later assumed the prosecution of the 757 patent on behalf of Dr. Mirowski. A reissue application for the 757 patent was filed on February 25, 1972.

The application for the 536 patent was filed by Medtronic counsel on behalf of Dr. Mirowski on March 15, 1971, as patent application Serial No. 124,326 (the 326 application). At the time, Medtronic was undertaking prosecution of both Dr. Mirowski's patent applications under an agreement with Dr. Mirowski to develop the invention of the 757 patent application, an automatic defibrillator. Medtronic subsequently decided to discontinue its defibrillation program and its relationship with Dr. Mirowski and assigned the patent rights under the applications back to Dr. Mirowski. Dr. Mirowski's counsel, Mr. Cohn, thereupon undertook prosecution of the patent applications on behalf of Dr. Mirowski.

On May 2, 1972, Examiner Kamm performed a prior art search in connection with the 326 application and found the Hopps article which he cited to Medtronic counsel in a letter of August 3, 1972. Sometime prior to August 7, 1972, however, Medtronic had a copy of the Hopps reference in its corporate library, although Medtronic disputes whether the Medtronic counsel prosecuting the 757 patent were aware of it. In any event, after being informed of the Hopps article by Examiner Kamm with regard to the 326 application, Medtronic failed to cite the article to Kamm with regard to the 757 patent application despite its responsibility under the agreement with Dr. Mirowski for prosecution of the 757 application. Having cancelled its relationship with Dr. Mirowski by a notice dated September 14, 1972, Medtronic, in letters of September 29, 1972, and October 12, 1972, to Mr. Cohn stated that its cancellation of its defibrillation program was based, in part, on its belief that the Hopps article invalidated the 757 patent because it disclosed the use of an electrode positioned within the heart for defibrillation.[3]

---

**2.** Examiner Kamm handled both the application for the 757 patent and the application for the 536 patent. He also reexamined both the patents-in-suit.

**3.** The September 29, 1972, letter states:
We have reviewed the defibrillator program and as indicated in our cancellation notices

dated September 14, 1971 (sic) to Drs. Mirowski and Mower, we have decided to discontinue the program. *Therefore,* we have undertaken and completed a comprehensive study of the issued patents and pending applications involved in the program.

After Medtronic assigned the patent rights back to Dr. Mirowski in an assignment dated November 14, 1972, Dr. Mirowski executed a power of attorney to Ronald Cohn on November 20, 1972. Mr. Cohn thereupon prosecuted the 757 and 326 applications on behalf of Drs. Mirowski and Mower. In a letter of November 28, 1972, to Examiner Kamm regarding the 757 application, Mr. Cohn cited the Hopps reference and other articles saying that "none of these references is any more pertinent than those already cited in connection with the prosecution of this application." Mr. Cohn did not submit a copy of the Hopps reference to Examiner Kamm.

### 2. Conduct During the Reexamination of the 757 Patent

Medtronic alleges certain statements made by Dr. Mower during the reexamination of the 757 patent with regard to the teachings of the Hopps article and the possibility of spontaneous defibrillation in small dogs constituted inequitable conduct. Medtronic also alleges that Dr. Mower intentionally withheld certain publications which contradict his statements to Examiner Kamm about spontaneous defibrillation in small dogs and the success of the Hopps experiments. Finally, Medtronic alleges that Dr. Mower intentionally withheld from Examiner Kamm the fact of his professional relationship with Dr. Mirowski.

During the reexamination of the 757 and 536 patents initiated by Medtronic in connection with this litigation, Medtronic submitted a copy of the Hopps reference to Examiner Kamm. All of the claims of the 757 patent were initially rejected by Examiner Kamm on the basis of Hopps teaching of direct application of cardioverting energy to the heart.[4] As part of the reexamination proceedings, Dr. Mower was interviewed by Examiner Kamm and submitted an affidavit concerning the Hopps article.

The Hopps reference discloses the findings of Dr. Hopps' attempts in 1954 to defibrillate a number of dogs. In the portion of the reference entitled "Closed Chest Defibrillation", the first attempt discussed involved a "modification of the intracardiac catheter electrodes as they lay in various portions in the right atrium and right ventricle." Trial Exhibit 1172, p. 841. As the article explains,

"[i]n every case but one, fibrillation persisted about the apex, and it was impossible to reach this extremity of the ventricles with the shock. In each instance, there was an area of burnt tissue around the electrodes after three or four shock applications. The one exception was a ten-kilogram dog whose heart was defibrillated on the fifth attempt ..."

Id. The ten-kilogram dog was one of the smallest dogs in Hopps' experiment. Id.

In Dr. Hopps' next experiment, "a single electrode catheter in the heart and a large dispersive electrode on the front of the chest, over the apex of the heart" was used. Id. at 841–43. As explained in the article, "the technique proved fairly satisfactory in five of the eleven dogs." Id. at 843. Two of the five successes, however, were discounted because "the first attempts to defibrillate were unsuccessful, and it was necessary to open the chest, massage, and defibrillate with conventional electrodes before performing further tests with atrium-chest electrodes. Subsequent defibrillations by this method did not constitute valid tests under closed chest conditions." Id. Thus, closed chest defibrillation was successful in only 3 of 11 dogs. Dr. Hopps' report concluded:

5. Shocks applied through an intracardiac catheter were not effective in

---

Trial Exhibit 269 (emphasis added). Lilly argues that the inference from the timing of the letters and the language of the September 29, 1972, letter is that Medtronic decided to cancel its defibrillator program and relationship with Drs. Mirowski and Mower and *then* decided to use the Hopps reference as justiciation for doing so. Medtronic contends that the Hopps reference was "The straw that broke the camel's back," leading to cancellation of Medtronic's relationship with both doctors. Trial Transcript, Testimony of Donald Stone, Day 8, p. 153).

4. Lilly contends, and the testimony of Medtronic's expert, Professor Samuel Sutton, supports the fact that claims of patents are routinely, initially rejected in reexamination only to be later allowed without modification.

cardiac defibrillation. It was impossible to arrest the ventricular muscle around the apex by this method.

6. With a single intracardiac electrode and a dispersive electrode on the chest over the heart, closed-chest defibrillation was possible in smaller dogs. As in open-chest technique, there appears to be a relationship between the size of the dog and the ability to defibrillate.

*Id.*

Dr. Mower's affidavit to Examiner Kamm stated that the first closed chest technique was a failure and discussed this technique. Trial Exhibit 1173, para. 5–6. Dr. Mower noted that the second technique was reported as "fairly satisfactory" in five of the eleven dogs that were tested. *Id.* at para. 8. Dr. Mower explained that two of the five successes were discounted by Hopps and, thus, that "only three of the eleven dogs were apparently defibrillted in the manner intended." *Id.* at para. 7–8. Dr. Mower then noted that the three dogs that were defibrillated had weights lower than those dogs that could not be defibrillated. *Id.* at para. 9. Dr. Mower indicated in his affidavit that Hopps himself reached a similar conclusion that "there appeared to be a definite relationship between the size of the dog and our ability to defibrillate ... [w]ith a larger dog, the greater the size of heart and increased current path undoubtedly contribute to the difficulty of defibrillation." *Id.* at para. 9.

Dr. Mower concluded his affidavit to Examiner Kamm by explaining that the Hopps reference would teach a person of ordinary skill in the art "that delivering large energies through a catheter/dispersive electrode arrangement would not be successful for larger hearts, such as human hearts." *Id.* at para. 13. Dr. Mower explained his conclusion by stating, "I believe that Hopps et al recognized this when they concluded, at page 848, that closed-chest defibrillation with a catheter electrode and dispersive electrode was possible in smaller dogs, in view of their further conclusion that there appears to be a relationship between the size of the dog and

the ability to defribrillate (sic) (p. 848)." *Id.* Dr. Mower further concluded in his affidavit that "[t]he Hopps et al experiments were totally unsuccessful *for larger* dogs having heart sizes that would be closer to the size of a human heart. As such, one would be convinced by the Hopps et al teaching that the human heart would similarly be unsuccessfully treated." *Id.*

In his affidavit, Dr. Mower also stated that the dogs that Hopps reported as "successes" might have spontaneously defibrillated. Dr. Mower explained:

"[I]t is possible that the dogs may have spontaneously defibrillated ... It is well known that smaller animals frequently spontaneously defibrillate. Hopps et al themselves state, at page 840, that "[i]n human beings, as in most of the larger animals, it [fibrillation] is usually not reversible spontaneously," thus implying what is generally known, i.e., that small animals can defribillate spontaneously. Thus, I cannot be certain that the return to normal heart rhythm of the three small dogs resulted from the energy that was applied via the catheter dispersive electrode arrangement, and not the phenomenon of spontaneous defibrillation."

*Id.* at para. 11.

In his trial testimony, Dr. Hopps testified that his article taught those of ordinary skill in the art that larger dogs or larger hearts could *not* be defibrillated by the method discussed in his article. Trial Transcript, Testimony of Dr. John Hopps, Day 10, p. 160 (emphasis added). Dr. Mower, in his testimony at trial, maintained his belief that small dogs occasionally spontaneously defibrillate and that spontaneous defibrillation might have been the reason for the successes reported in the 3 dogs that were defibrillated. Trial Transcript, Testimony of Dr. Morton Mower, Day 11, p. 68, p. 72, p. 112–14.

Medtronic further contends that Dr. Mower intentionally withheld from Examiner Kamm a 1974 publication of his which purportedly contradicts his statements to Examiner Kamm regarding spontaneous

defibrillation.[5] Dr. Mower's publication confirms that ventricular fibrillation can be spontaneously reversed in small animals such as frogs, turtles, and cats. The article, however, also includes a statement to the effect that spontaneous defibrillation "has never been observed in over 200 dogs of the body weight range described in the present experiments."[6] Trial Exhibit 1178, p. 860. At trial, Dr. Mower explained that the statement was "the experience of two of our co-authors. It certainly wasn't my own experience. I had seen spontaneous defibrillation many times and the literature amply supported the fact that it occurs." Trial Transcript, Testimony of Dr. Morton Mower, Day 11, p. 72.

To sustain the defense of inequitable conduct, Medtronic must prove two things by clear and convincing evidence: 1) that Drs. Mirowski or Mower or their counsel misrepresented or failed to disclose material information to the PTO in the prosecution and reexamination of the patents-in-suit, and 2) that such misrepresentation or omission was intentional or the result of gross negligence. *Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1094 (Fed.Cir. 1987). *See also FMC Corp. v. The Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987) (one who alleges failure to disclose as inequitable conduct must offer clear and convincing proof of: 1) prior art or information that is material; 2) knowledge by the applicant of the materiality of the prior art or information; and 3) failure to disclose resulting from an intent to mislead the PTO).

The United States Court of Appeals for the Federal Circuit has stated that a trial court, in determining a claim of inequitable conduct, must balance the materiality of any withheld reference with the level of intent with which the prior art was withheld from the PTO. *FMC Corp.*, 835 F.2d

at 1415; *Laitram Corp. v. Cambridge Wire Cloth Co.*, 785 F.2d 292, 294 (Fed.Cir. 1986); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1363 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Having reviewed all the evidence with regard to Medtronic's specific allegations of inequitable conduct on the part of Dr. Mirowski and his counsel during the prosecution of the 757 patent, I can only conclude that Medtronic has failed to prove by clear and convincing evidence that Dr. Mirowski or his counsel was guilty of any intentional or even grossly negligent withholding of any material information before the PTO.

First, the materiality of the Hopps article as a prior art reference is marginal at best. While the Hopps reference does disclose the use of an electrode positioned within the heart for defibrillation, the results of Dr. Hopps' experiments concluded that shocks applied through an intracardiac catheter were not effective in cardiac defibrillation and that delivering large energies through a catheter dispersive electrode arrangement would not be successful for larger, human hearts. In his testimony at trial, Dr. Hopps himself admitted that this was the conclusion of his experiments and the teaching of his reference. The few successes which Hopps achieved were with the smaller of the dogs involved in the experiments. If anything, the Hopps article teaches that one could not successfully defibrillate a heart the size of a human heart through the techniques disclosed in the reference. The failure of Medtronic counsel to cite the Hopps article to Examiner Kamm while they were prosecuting the 757 patent on behalf of Dr. Mirowski suggests that, at the time, Medtronic counsel, too, thought the article of little relevance. It certainly cannot be concluded that Examiner Kamm would have considered the

---

**5.** Medtronic also contends that Dr. Mower should have disclosed certain other publications including the Wiggers and Garrey references. The Wiggers reference states that, in the hearts of larger animals, fibrillation is irrevocable and notes that in over 400 cases of fibrillation in dogs, only a single recovery was witnessed. Trial Exhibit 1406, p. 399. The Garrey reference states that the ventricles of dogs do not usually recover spontaneously from fibrillation, although they do so in rare instances. Trial Exhibit 1174, p. 397.

**6.** The dogs to which the 1974 article refers weighed 12–25 kilograms. Trial Transcript, Testimony of Dr. Morton Mower, Day 11, p. 74. The dogs in the Hopps experiments weighed 10–22 kilograms. Trial Exhibit 1172, p. 843.

Hopps reference important in deciding whether to allow the 757 patent application or that, but for the Hopps reference, he would not have allowed the patent to issue. *See, e.g., J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559 (Fed.Cir. 1984) (setting forth standards in determining materiality of nondisclosed information). Contrary to Medtronic's contention, moreover, the fact that the claims of the 757 patent were initially rejected on the basis of Hopps during the reexamination of the 757 patent does not establish the materiality of the reference given the fact that all the claims were eventually allowed over the reference.

Even if there was some marginal materiality to the Hopps reference, Medtronic has made no showing that the failure of Dr. Mirowski or his counsel to provide a copy of the reference to Examiner Kamm was the result of an intent to mislead or deceive the PTO. *See, e.g., Akzo v. E.I. Du Pont de Nemours & Co.,* 810 F.2d 1148, 1152 (Fed.Cir.1987). At the time Dr. Mirowski's counsel, Mr. Cohn, cited Hopps to Examiner Kamm, he stated that it was no more pertinent than any other references previously cited to the PTO. Medtronic has produced no evidence showing that Mr. Cohn and Dr. Mirowski did not believe this to be the case at the time they made such a representation to the PTO. Medtronic has not shown that the failure to provide a copy of the Hopps article to Examiner Kamm was anything other than the result of Dr. Mirowski's and Mr. Cohn's good-faith belief that the reference was irrelevant to the 757 patent application. *See, e.g., Allen Archery, Inc.,* 819 F.2d at 1095 (failure to cite competitor's patent as prior art did not constitute inequitable conduct where applicant had good-faith belief that competitor's patent was not material to the prosecution of applicant's patent). Such a belief, moreover, given the testimony at trial, has been shown to be a reasonable one. *See, e.g., Argus Chemical Corp. v. Fibre Glass-Evercoat Co., Inc.,* 759 F.2d 10, 14-15 (Fed.Cir.1985) (subjective good faith of counsel in not disclosing prior art does not negate inequitable conduct). *See also Laitram Corp.,* 785 F.2d at 294 (*Ar-*

*gus* did not hold that subjective good faith is never a defense to a claim of inequitable conduct; rather, materiality and intent must be balanced). It was, further, not unreasonable for Dr. Mirowski or Mr. Cohn to conclude that Examiner Kamm had a copy of the Hopps reference since it was Kamm who first cited the reference to Medtronic counsel in 1972. I conclude that the Hopps reference was not material, that neither Dr. Mirowski nor his counsel intentionally or negligently withheld the reference, and that their failure to provide a copy of Hopps to Examiner Kamm during the initial prosecution of the 757 patent did not amount to inequitable conduct.

Medtronic has also failed to sustain its burden with regard to its allegations of inequitable conduct on the part of Dr. Mower during the reexamination of the 757 patent. Medtronic has not shown how Dr. Mower's statements to Examiner Kamm intentionally mislead, or misrepresented, or withheld material information regarding the Hopps reference. Dr. Mower's affidavit to Examiner Kamm accurately reflected the success and failure of the Hopps experiments and indicated that Hopps had recognized a relationship between the size of the dog and the ability to defibrillate, with the difficulty increasing with the size of the dog. Dr. Mower represented to Examiner Kamm that Hopps did not teach the successful application of defibrillating energy to larger, human hearts, a conclusion which Hopps himself confirmed at trial.

Medtronic's most strenuous contention, however, has been its claim that Dr. Mower intentionally misrepresented to Examiner Kamm the likelihood that some of the Hopps successes could be attributed to spontaneous defibrillation in small dogs. Dr. Mower stated in his affidavit that he could not be certain that the successes achieved by Hopps were not the result of spontaneous defibrillation. As he explained at trial, Dr. Mower suggested this possibility because he believed spontaneous defibrillation in small animals to be a frequent occurrence. I find no intent on Dr. Mower's part to mislead Examiner Kamm by failing to provide his 1974 article or the

Wiggers or Garrey references which contradict his position on spontaneous defibrillation. As Dr. Mower testified at trial, he believed other literature, to which specific reference was made, fully supported his opinion that small animals can spontaneously defibrillate. Trial Transcript, Testimony of Dr. Morton Mower, Day 11, p. 112, 124–129.

Finally, Medtronic contends that Dr. Mower intentionally failed to disclose to Examiner Kamm his relationship with Dr. Mirowski. Medtronic argues that, because Dr. Mower has an agreement with Dr. Mirowski whereby Dr. Mower will receive a percentage of any recovery in this litigation, Dr. Mower should have disclosed this potential conflict to Examiner Kamm during the reexamination. At trial, Dr. Mower stated that he believed Examiner Kamm was aware of his close collaboration with Dr. Mirowski because both doctors were listed as inventors on the 536 patent and Examiner Kamm was handling both the 757 and 536 reexaminations.

I can find no inequitable conduct on the part of Dr. Mower in failing to disclose to Examiner Kamm his working relationship with Dr. Mirowski and his interest in this litigation. Dr. Mower testified that he believed Examiner Kamm knew of his association with Dr. Mirowski since both were listed as inventors of the 536 patent. This is a reasonable conclusion, moreover, since Examiner Kamm had handled both applications for the patents-in-suit as well as their reexamination. While Dr. Mower's interest in this litigation might have been of some relevance to Examiner Kamm in evaluating Dr. Mower's statements during the reexamination, Dr. Mower's failure to disclose it is, at the most, an error of judgment which falls short of inequitable conduct. *See, e.g., Akzo,* 810 F.2d at 1152 (simple negligence or an error in judgment is never sufficient for a holding of inequitable conduct). An applicant need not disclose all information of pertinence to the PTO. The two controlling factors in determining a charge of inequitable conduct are the materiality of the withheld information and the intent of the actor. *Kimberly–Clark Corp. v. Johnson & Johnson Co.,* 745 F.2d

1437, 1454–55 (Fed.Cir.1984) (citing *American Hoist,* 725 F.2d at 1362–64). Inequitable conduct is not established upon a showing that information of some materiality was not disclosed to the PTO. Rather, one must have intended to act inequitably. *FMC Corp.,* 835 F.2d at 1415. I cannot conclude, on the basis of the evidence presented at trial, that Dr. Mower had any such intent in not informing Examiner Kamm of his interest in this litigation.

### B. *The 536 Patent*

With regard to the 536 patent, Medtronic alleges that the failure of Dr. Mower to disclose as prior art an article published by Drs. Mirowski and Mower in 1972 was inequitable conduct.

The 326 patent application, filed March 15, 1971, discloses a single intravascular catheter electrode system with a suggested inter-electrode spacing of 4 to 4½ inches when the catheter is used for ventricular defibrillation. Trial Exhibit 733, p. 16. The second application for the 536 patent, which was filed on September 19, 1973, as a continuation in part of the 326 application, discloses a single intravascular electrode system with inter-electrode spacing of at least 2½ to 3 inches. Trial Exhibit 628, p. 14. The claims of the 536 patent also disclose inter-electrode spacing ranging from 2½ inches to 4½ inches.

During the prosecution of the 536 patent application, in 1973, Drs. Mirowski and Mower represented to the PTO that the inter-electrode spacing of the 536 patent application was not taught by any references of record or any prior art. In April, 1972, Drs. Mirowski and Mower published a certain abstract in *Clinical Research* detailing a defibrillation system that uses a single intravascular catheter with two electrodes spaced by 3.5 to 4.7 inches. Trial Exhibit 1144. Medtronic contends that this abstract discloses a catheter system with electrode spacing within the claimed ranges of the 536 patent application. Medtronic thus argues that the 1972 abstract, having been published before the filing of the 536 patent application in 1973, is prior art which should have been disclosed to the

**1040**

PTO by Drs. Mirowski or Mower in the course of the prosecution of the 536 application.

The 326 patent application indicates that inter-electrode spacing of 4 to 4.5 inches is a "good average" and that the required spacing of the electrodes "will be slightly different from one patient to the next." Trial Exhibit 733, p. 16. The 326 application also indicates that the catheter electrode system disclosed in the patent application could be used in an atrial electrode arrangement in addition to its use in treating ventricular tachycardia and fibrillation. *Id.* at 9.

During the reexamination of the 536 patent, many of the new spacing claims of the patent were rejected as obvious in view of the Charms patent, Trial Exhibit 1319. This patent, which was cited to Examiner Kamm by Drs. Mirowski and Mower as "of interest only" during the prosecution of the 326 application, has a disclosure of spacing ranges interchangeable with those disclosed in the 1972 abstract. Examiner Kamm determined that, because the 1972 abstract recited spacing ranges not described in the 326 application, the spacing claims of the 536 patent were entitled only to the 536 patent continuation-in-part filing date of September 19, 1973, rather than the 326 application filing date of March 15, 1971.

Dr. Mower testified at trial that the 2½ inch inter-electrode spacing in the 536 patent corresponded to the size of the right atrium and that such spacing in the catheter's use in an atrial electrode arrangement was disclosed in the 326 patent application. Trial Transcript, Testimony of Dr. Morton Mower, Day 11, p. 100–101. Dr. Mower further testified that he believed a disclosure of inter-electrode spacing of 2 to 2½ inches was inherent in the September 19, 1971, application for the 326 patent. *Id.* Finally, Dr. Mower also testified that he considered the abstract published in 1972 to have been published *after* the application for the 326 patent and the disclosure in that application of inter-electrode spacing. *Id.*

Given Examiner Kamm's findings during the reexamination regarding the spacing claims of the 536 patent, the materiality of the 1972 abstract is confirmed. Such a conclusion, however, does not establish that Dr. Mower was guilty of inequitable conduct in failing to cite the 1972 abstract to the PTO during the prosecution of the 536 patent. Medtronic has not shown by clear and convincing evidence that Dr. Mower intentionally concealed the abstract from Examiner Kamm or otherwise intentionally misled him with regard to the patentability of the spacing ranges claimed in 536 patent. Dr. Mower's trial testimony explained his belief that the 2½ inch spacing range in the 536 patent was inherent in the 326 application and that the 1972 abstract was published after the filing date of the 326 application and was, thus, not prior art as to the 536 continuation-in-part application. Dr. Mower's failure to disclose the abstract, moreover, is made less significant given the fact that the Charms patent was cited by the inventors to Examiner Kamm during the prosecution of the 536 application. Even though it was cited as "of interest only", Charms, nonetheless, contains spacing claims identical to those in the abstract. Had Dr. Mower intended to conceal the spacing claims disclosed in the abstract, he certainly would not have disclosed the equally damaging Charms patent to Examiner Kamm. Balancing the materiality of the abstract against the lack of any showing by Medtronic of intent or gross negligence on the part of Dr. Mower, I must conclude that he is not guilty of any inequitable conduct before the PTO. *See, e.g., Akzo,* 810 F.2d at 1153 (although material misrepresentation was made to the PTO, patentee was not guilty of inequitable conduct where no showing was made of intent or gross negligence on the part of patentee). The 536 patent is, therefore, enforceable.

An appropriate order follows.

### ORDER

AND NOW, this 21st day of April, 1988, for the reasons stated in the accompanying memorandum, it is hereby ordered:

1. United States patents, No. Re. 27,-757, reexamined and issued as Bl Re. 27,-757, and No. 3,942,536, reexamined and issued as Bl 3,942,536, are valid and enforceable;

2. Judgment is hereby entered in favor of plaintiff Eli Lilly and Co. and against defendant Medtronic, Inc., in the amount of $26,500,000, plus an additional royalty of $166,000, totaling $26,666,000.